JACK COOPER TRANSPORT COMPANY, INC., a corporation, and American Fidelity and Casualty Company, a corporation, Plaintiffs in Error,

v.

Nowita GRIFFIN, Administratrix of the Estate of Denver H. Griffin, deceased, Defendant in Error.

No. 38402.

Supreme Court of Oklahoma.

Sept. 15, 1959.

Rehearing Denied Sept. 13, 1960.

Application for Leave to File Second Petition for Rehearing Denied Nov. 29, 1960.

Hudson, Hudson, Wheaton & Kyle, Tulsa, for plaintiffs in error.

Floyd L. Walker and Dyer, Powers & Gotcher, Tulsa, for defendant in error.

BERRY, Justice.

On November 13, 1951, at approximately 10:30 p. m. a fire occurred at the filling station of Ed Hamilton, hereafter referred to as "Hamilton's Station", in Pryor, Oklahoma, which fire resulted in the death of Denver H. Griffin, hereafter referred to as "deceased".

Nowita Griffin, defendant in error and surviving spouse of deceased, hereafter referred to as "plaintiff", brought this action against Ed Hamilton and plaintiffs in error, Jack Cooper Transport Company, Inc., hereafter referred to as "transport company" and Fidelity and Casualty Company, transport company's insurance carrier, to recover damages for the alleged wrongful death of deceased. When referred to collectively, plaintiffs in error will be referred to as "defendants".

On and prior to date of the fatal accident, transport company's principal business was transporting motor vehicles under a contract with General Motors from Kansas City, Missouri, into Oklahoma and seven other states, including Missouri. Of the approximately 175 trucks used in said transporting business, "roughly 30" were used over a route that passed through Pryor,

Oklahoma, and by Hamilton's station. On the date and at the time first referred to herein, three of transport company's transport trucks approached Hamilton's station from the South. The lead truck was driven to a point between the Hamilton station and four gasoline pumps which had been installed approximately 14 feet east of the station at which point the truck was stopped. The truck was equipped with two "saddle tanks", one of which was welded to the left frame of the truck immediately back of the left side of the cab of the truck, and the other was welded to the right frame of the truck immediately back of the right side of said cab. Upon the truck being stopped, the driver of the truck requested the filling-station attendant to put 20 or 30 gallons of gasoline in the left saddle tank. The driver then went into the filling station where he remained until the station was in flames.

In order to fill the tank, the attendant laid the gasoline hose of the nearest gasoline pump across the metal framework of the truck immediately back of the truck cab. The metal nozzle of the hose came to rest on the framework of the truck. The nozzle was connected to the metal framework of the gasoline pump (and the concrete upon which the pump set) by a coil of wire inside the gasoline hose, which wire was built into the gasoline hose in order to ground static electricity originating in the nozzle of the hose or in objects that the nozzle comes in contact with. The attendant then walked around the front end of the truck, unscrewed the cap to the intake of the left saddle tank, inserted the nozzle of the gasoline hose and released the valve which permitted gasoline from the storage tank under the gasoline pump to flow through the pump and hose and into the saddle tank. Within a very short time (possibly 10 seconds) after the gasoline had started flowing into the saddle tank a "blaze came right up out of the hole of the (saddle) tank". The blaze increased rapidly. The attendant dropped the gasoline hose and, notwithstanding the trigger to the valve in the nozzle had not been locked in

place, gasoline continued to flow from the hose onto the cement driveway of the station.

The driver of the transport did not give the filling-station attendant instructions relative to flowing gasoline into the saddle tank and apparently transport company had never given any person connected with the station, instructions on said matter nor were printed instructions of any kind relative to the procedure to be followed in filling the saddle tank appended to the transport truck. There is no evidence that the driver of the truck sought permission from the attendant to flow gasoline into the saddle tank or that permission would have been refused if requested.

Deceased had gone to the Hamilton station a short time prior to the incident above referred to, and at the time the attendant began to fill the saddle tank on the truck he, as a patron of the station, was attempting to repair an automobile tire or tube on the inside of the station. Within a very short period after the flame started at the mouth of the saddle tank, the interior of the filling station was engulfed in flames. It appears that deceased and three or four other persons who were in the station were of the conviction that they could only escape through a window to the toilet on the inside of the station, and after deceased had concluded that it was impossible to escape through the window, he ran out the front door of the station which was directly west of the cab of the truck that was being serviced when the fire started, and as a result of burns sustained inside the station and running through the flames outside the station, he sustained first-degree burns from which he died. Three other persons lost their lives as a result of the fire, all of whom were apparently inside the station when the fire started.

The record discloses that no one was smoking near the truck being serviced at the time the fire started; that no other vehicles were operating in the vicinity and that the only flame near the truck was one from a stove inside the station.

The defendant in error's position or theory is that the fire resulted in the nozzle of the hose used in flowing gasoline into the saddle tank not being kept in contact with the lip or intake of the saddle tank in violation of a regulation of the Interstate Commerce Commission that is hereafter quoted; that static electricity was created by the gasoline coming in contact with the nozzle of the hose and the side of the saddle tank; that a spark jumped from the side of the saddle tank to the metal nozzle or from the nozzle to the tank, causing the gasoline vapors around the mouth of the saddle tank to ignite and bring about the unfortunate holocaust.

The attendant testified that he did not know whether he kept the nozzle of the gasoline hose in contact with the opening to the saddle tank. It is not claimed that gasoline could not be flowed into the tank without waste of gasoline if the nozzle was not kept in contact with the intake of the tank, and from the description of the tank, it appears that the tank could be filled without waste of fuel by not engaging the nozzle with the intake of the tank.

A person trained and experienced in fire prevention testified that static electricity is created by two different and distinct materials coming in contact with each other; that gasoline coming in contact with the side of the saddle tank would cause static electricity to build up; that so long as a continuous contact is maintained between two separately-charged materials a static spark will not occur and, therefore, if the nozzle of the hose were kept in contact with the sides of the saddle tank a static spark would not have occurred; that the flame in stove on the interior of the station did not cause the fire; that since the fire started at the mouth of the saddle tank, the fire, in his opinion, resulted from a static spark that occurred because the attendant did not keep the nozzle of the hose in contact with the side or lip of opening to said tank; that large trucks will build up electricity traveling over the highways; that the matter of laying the nozzle on the frame of the truck before beginning to flow gasoline into the

saddle tank would ground out or bleed off static electricity in the truck. From this witness' testimony jury was entitled to conclude that any static electricity in body or clothing of attendant when he began to fill saddle tank was grounded out through attendant placing his hand on the nozzle of hose which as aforesaid was grounded by coil of wire inside the hose.

Another person trained and experienced in fire prevention testified in answer to a hypothetical question which included all relevant facts, that in his opinion "the fire was caused by a static electric spark discharged between the nozzle and the tank."

Defendants did not introduce evidence relative to the cause of the fire, other than evidence introduced through cross examination of witnesses who appeared for plaintiff.

The jury returned a verdict against defendants but not against Ed Hamilton who was a defendant below. Judgment was subsequently entered on the verdict. From order overruling defendant's motion for new trial, this appeal was perfected.

Defendants contend that "the evidence was insufficient to establish a cause of action in favor of plaintiff and against defendants"; that answer of expert witness was not based on proved facts but upon assumed facts; that while circumstantial evidence will sustain a verdict, the weight of circumstantial evidence is not here involved because the circumstances "themselves rest upon conjecture and speculation"; that the trial court erred in admitting the ICC rules and regulations in evidence and in admitting conclusions of the expert witnesses.

■ We have frequently stated that " 'In a civil case, in order to establish his claim, plaintiff need only make it appear to be more probable that injury came in whole or in part from defendant's negligence than from any other cause, and such fact may be established by circumstantial evidence and reasonable inferences to be drawn therefrom.' " And that " 'If there is any evidence which reasonably tends to prove directly or indirectly or by permissive inference the essential facts,

the verdict of jury must·stand.' " Magnolia Petroleum Co. v. Angelly, Okl., 306 P.2d 309, 315. See also Mid-Continent Pipe Line Co. v. Price, 203 Okl. 626, 225 P.2d 176, 177; Service Pipe Line Co. v. Donahue, Okl., 283 P.2d 844.

The authorities appear to be in accord on the proposition that a cause of action in a civil case may be proved by circumstantial evidence. 32 C.J.S. Evidence § 1039, p. 1099; Cities Service Gas Co. v. Eggers, 186 Okl. 466, 468, 98 P.2d 1114, 1117, 126 A.L.R. 1278; Ramsey Oil Co. v. Dunbar, 172 Okl. 571, 46 P.2d 535.

■ In the case last above cited it is pointed out in the third paragraph of the syllabus that "Circumstantial evidence in a civil case, in order to be sufficient to sustain a verdict, need not rise to that degree of certainty which will exclude every reasonable conclusion other than the one arrived at by the jury."

The Circuit Court of Appeals, 1st Circuit, held in Standard Oil Co. of New York v. R. L. Pitcher Co., 289 F. 678, 683, that in an action for damages against the owner of a gasoline filling station for fire alleged to have been caused by the generation of static electricity by reason of failure to use a safety chain to ground flow of electricity, "It was not necessary that the plaintiffs show that a static spark was actually produced; but it was sufficient if conditions and circumstances were shown from which the inference could be reasonably drawn that a static spark was produced. * * *" The Court then pointed out that contentions based upon the proposition that the fire might have resulted from fire in a locomotive in a railroad yard which was near the point of the accident (it was not shown that a locomotive was operating in the yard), or from a fire in a home nearby were nullified by the fact that the fire originated near the truck.

The plaintiff in Bacon v. A.B.A. Independent Oil & Gasoline Co., 111 Neb. 830, 198 N.W. 143, 33 A.L.R. 769, sought to recover damages resulting from personal

injuries sustained as the result of an explosion which occurred when gasoline was being pumped into his motorcycle which was equipped with a presto lamp that was lighted. The defendant argued that there was no evidence to show that the gasoline was ignited by the flame from the presto lamp. In rejecting said argument, the Court had this to say:

"* * * The evidence does not disclose the exact distance that the presto lamp was from the intake of the gas tank on the motorcycle, but there is sufficient (evidence) to indicate that it could not have been more than two feet. No other cause for, or source of, ignition than the presto lamp was shown to exist. 'When a cause is shown which might produce an accident in a certain way, and an accident happens in that manner, it is a warrantable presumption, in the absence of showing of other cause, that the one known was the operative agency in bringing about the result.' Brownfield v. Chicago, R. I. & P. R. Co., 107 Iowa 254, 258, 77 N.W. 1038, [5 Am.Neg.Rep. 331]."

The above quoted rule is quoted with approval in Ft. Wayne Drug Co. v. Flemion, 93 Ind.App. 40, 175 N.E. 670, 674.

The plaintiff, in our opinion, showed by competent evidence that the fire which resulted in the fatal injury was caused by a static spark which originated at or near the opening of the saddle tank; that the static spark was caused by gasoline flowing against the side of the saddle tank, and that the static electricity would have been grounded out if the nozzle of the gasoline hose had been kept in contact with the saddle tank.

■ Defendants contend that before plaintiff could make a prima facie case under her theory of the case, it was necessary for her to prove that at the time of the fire the coil of wire inside the gasoline hose which connected the nozzle of the hose to the tank was intact. Plaintiff proved that the hose contained such a wire and since she did, the presumption will be indulged that the hose was in its normal or natural condition at the time of the accident and that the wire, therefore, was intact and would serve to bleed off static electricity at the time the fire started. 65 C.J.S. Negligence § 230, p. 1045; Great Western Coal & Coke Co. v. Cunningham, 43 Okl. 417, 143 P. 26.

■ Plaintiff was permitted to introduce in evidence over defendants' objection, Regulation No. 193.33 of the Interstate Commerce Commission, hereafter referred to as "ICC", which regulation reads as follows:

"193.33. Special precautions during fueling process—(a) care to prevent ignition of fuel. No motor vehicle shall be fueled or be permitted to be fueled with engine running, or in the presence of any open flame. Care shall be exercised to prevent the ignition of fuel by lighted cigars, cigarettes, pipes, or other sources of ignition.

"(b) Electric grounding of fuel hose. The nozzle of the fuel hose shall be in contact with the intake of the fuel tank throughout the fueling process."

The above quoted regulation and an ICC regulation to the effect that "Every driver shall be competent by reason of experience or training to operate safely the type motor vehicle or motor vehicles which he drives. Every driver shall be familiar with the rules and regulations established by the Commission pertaining to the driving of motor vehicles" was set forth in "Instruction No. 7" to the jury. The defendants excepted to said instruction.

The regulation first above quoted appears as Sec. 193.33, Title 49, Ch. 1, C.F.R. The regulations last above quoted appear as Sec. 192.3(f), (g), Title 49, Ch. 1, C.F. R. and the 1952 amendment of said sections appears as 191.4, 191.5 in pocket part of said volume. The substance of the last referred-to sections in effect in 1951

and those which went into effect in 1952 are the same.

In Tri-State Casualty Ins. Co. v. Loper, 10 Cir., 204 F.2d 557, 559, the Court held that reasonable ICC regulations in keeping with statutory authority governing the operation of motor vehicles in interstate commerce "have the effect of law." It is not contended that the ICC regulations in controversy are not reasonable nor that the ICC was without authority to promulgate same. The trial court, therefore, did not err in permitting plaintiff to introduce in evidence the regulations which are above quoted, or in taking judicial notice of the regulations presently appearing as Sections 191.4, 191.5, supra, provided said regulations bear upon the issues presented by the pleadings and evidence.

The ICC regulation which bears directly on the issue of whether failure to keep the nozzle of the fuel hose in contact with the intake of the fuel tank throughout the fueling process constituted negligence is Sec. 193.33(b), supra. In our opinion Sec. 193.33(a), supra, also has a bearing on the issues presented by the pleadings and evidence. If the fire was caused from the flame in the stove inside the station or from a motor vehicle which was permitted to operate while gasoline was being flowed into the saddle tank, the regulation was violated, and if due care was not taken to prevent ignition of the gasoline vapors "by lighted cigars, cigarettes, pipes, or other sources of ignition" the regulation was also violated.

We are of the further opinion that the ICC regulations to the effect that a driver shall be competent and experienced and shall be familiar with the ICC regulations also has a bearing on the issue of whether transport company exercised care in complying with Regulation 193.33, supra.

Defendants contend that if gasoline was negligently flowed into the saddle tank or flowed into said tank in violation of ICC regulations, the filling-station attendant and not transport company's driver was negligent and for said reason transport company would not be liable.

It is pointed out in 38 Am.Jur. "Negligence", Sec. 13, p. 655, that "one upon whom the law has imposed a duty of care cannot avoid his responsibility for its faithful discharge by contracting with another for its performance." In 27 Am. Jur. "Independent Contractors", Sec. 48, p. 525, it is stated that "if a statute or municipal ordinance requires a person to take a certain precaution when work is being done, and such precaution is not taken, it is no defense that a contractor was employed to do the work and that the failure to take the precaution was due to the contractor's negligence." The quoted principles of law are applicable to the facts of the instant case.

We stated in the second paragraph of the syllabus to Huckins Hotel Co. v. Clampitt, 101 Okl. 190, 224 P. 945, that "Where a person, either by contract or by law, owes an obligation to another, he cannot escape liability for negligence in performance of such obligation by delegating the duty to an independent contractor." See also Shell Pipe Line Corporation v. Curtis, Okl., 287 P.2d 681, 685, and Oklahoma R. Co. v. Boyd, 140 Okl. 45, 282 P. 157, 161.

If transport company and other truckers subject to the ICC regulations in controversy were permitted to delegate the duty of using care in placing motor fuel in their motor vehicles, the ICC regulations bearing on said operation would in effect be set aside. Under the cited authorities, transport company was not permitted to delegate the duty of complying with the ICC regulations in controversy to another, and said company is therefore liable in damages if it is proved that a violation of said regulations was the proximate cause of the accident that resulted in decedent's death. We are of the opinion that the jury under proper instructions found that transport company's violation of the applicable ICC regulations heretofore re-

ferred to was the proximate cause of the accident and resulting death.

We are of the opinion that the hypothetical questions asked the expert witness were based on relevant, proved facts and that defendants' objection to said questions is therefore not well taken. It appears that defendants may have overlooked the proposition that an expert witness may establish "in whole or in part, as the result of scientific knowledge or personal observation, the facts hypothetically assumed", (32 C.J.S. Evidence. § 553, p. 361) which rule is particularly applicable to the testimony of the expert witness whose testimony is first referred to herein.

Affirmed.

DAVISON, C. J., WILLIAMS, V. C. J., and HALLEY, BLACKBIRD and IRWIN, JJ., concur.

WELCH, JACKSON, and JOHNSON, JJ., dissent.